IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WELLS FARGO CLEARING SERVICES, LLC a/k/a WELLS FARGO ADVISORS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> PRUDENTIAL ANNUITIES LIFE ASSURANCE CORPORATION, et al., <br><br> Defendants. | No. 19-cv-06785 <br><br> Judge Andrea R. Wood |

**MEMORANDUM OPINION AND ORDER**

Patrick Kinney, now deceased, had several accounts with Plaintiff Wells Fargo Advisors, LLC ("Wells Fargo"). Among those accounts was a transfer-on-death ("TOD") account, which was linked with an annuity issued and held by Defendant Prudential Annuities Life Assurance Corporation ("Prudential"). After Kinney's death, Wells Fargo discovered that there were multiple potential claimants to the death benefit for the Annuity, specifically Defendants Luke Starkenburg, Margaret Kedzierzawksi, and the Estate of Patrick Kinney ("Estate"). Wells Fargo subsequently brought this action for declaratory relief, seeking an order declaring the proper beneficiary. Both Starkenburg and, collectively, Kedzierzawski and the Estate have asserted counterclaims, asserting that they are the proper beneficiary or beneficiaries of the Annuity.[1] Additionally, Starkenburg has asserted counterclaims against Wells Fargo for breach of contract,

---

[1] Pursuant to 28 U.S.C. § 1335, Federal Rule of Civil Procedure 67, and Local Rule 67.1, the Court ordered Prudential to deposit the death benefit due under the Annuity with the Clerk of the Court. (Dkt. No. 30.) Upon deposit, the Court discharged Prudential from any and all liability related to the Annuity. (*Id.*) Prudential subsequently properly deposited a check in the amount of $172,712.13.

breach of fiduciary duty, and negligence, in the event he is not deemed the intended beneficiary of the Annuity. Prudential deposited the amount due pursuant to the death benefit with the Clerk of Court and was discharged from any and all liability related to the Annuity. Wells Fargo, Starkenburg, Kedzierzawski, and the Estate all now move for summary judgment as to the proper beneficiary of the Annuity. Wells Fargo also seeks summary judgment on Starkenburg's counterclaims. As explained below, however, this Court cannot reach those issues on their merits because it lacks subject-matter jurisdiction. Accordingly, this case is dismissed without prejudice.

## BACKGROUND

Wells Fargo provides financial services and is an authorized broker of Prudential's annuity contracts. (Def. Starkenburg's Statement of Material Facts ("DSSMF") ¶¶ 8, 10, Dkt. No. 60.). Amy Trotter is a financial advisor employed by Wells Fargo licensed to sell annuities, among other financial products. (*Id.* ¶ 8.) Kinney was Trotter's client from 2007 until his death in 2019. (*Id.* ¶ 9.) On June 23, 2008, Kinney executed an Advanced Series Advisor Plan III contract ("Annuity") with Prudential. (Pl.'s Statement of Material Facts ("PSMF") ¶ 8, Dkt. No. 54.) Trotter was listed as the broker for the Annuity. (DSSMF ¶ 11.) On June 6, 2014, Kinney opened an individual TOD account. (*Id.* ¶ 14.) The Annuity was then "networked in" to the TOD account to allow financial advisors at Wells Fargo, including Trotter, to view the Annuity as part of Kinney's assets. (PSMF ¶ 11.) At all times, however, Prudential remained the holder of the Annuity. (*Id.*) In addition to the TOD account, Kinney maintained two other accounts (an individual account and an IRA) with Wells Fargo. (*Id.* ¶ 12.)

Pursuant to the terms of the Annuity, in some circumstances a named beneficiary would be entitled to a sum of money upon Kinney's death ("Death Benefit"). (Def. Kedzierzawski's and the

Estate's Joint Statement of Material Facts ("DKEJSMF") ¶ 9.) Additionally, the terms specified that

> if the primary Beneficiary dies before death proceeds become payable, the proceeds will become payable to the contingent Beneficiary. If no Beneficiary is alive when death proceeds become payable or in the absence of any Beneficiary designation, the proceeds will vest in any surviving participant. If there is no surviving participant, the proceeds will vest in your estate.

(*Id.* ¶ 17.) When the Annuity was first executed, Kinney listed his then-wife, Margaret Kedzierzawski, also known as Margaret Kinney, as the named beneficiary. (DSSMF ¶ 12.) He did not list a contingent beneficiary. (*Id.*) On March 31, 2016, Kinney and Kedzierzawski divorced. (PSMF ¶ 22.) The Divorce Judgment contained a provision expressly dictating that any interest created by naming the non-owning party a beneficiary in an instrument, including an annuity, is "specifically revoked" by the non-owning party. (DKEJSMF ¶ 13.)

Immediately following the divorce, in April 2016, Trotter and Kinney discussed changing beneficiaries, although Kinney did not take immediate action to do so. (PSMF ¶ 24.) Later, in April 2017, Kinney contacted Trotter indicating his desire to name Starkenburg as the beneficiary on all his Wells Fargo accounts, writing that he "immediately want[ed] to change my beneficiaries on any & all my Wells Fargo accounts from my 4 children & ex wife (Margie) to a very close friend—Luke Arend Starkenburg." (DSSMF ¶ 49.) In response, Zachary Dalzell, a client associate at Wells Fargo, mailed change of beneficiary forms for the IRA and the TOD account to Kinney, who subsequently completed and returned the forms. (PMSF ¶¶ 25–26.) At no point did Kinney explicitly inquire into the status of the beneficiary designation for the Annuity held by Prudential. (PSMF ¶ 27.) This is true even though, from 2017 until Kinney's death, Prudential sent Kinney quarterly account statements listing Kedzierzawski as the beneficiary on the Annuity. (DKEJSMF ¶¶ 33–34.)

Kinney passed away on June 6, 2019. (PSMF ¶ 28.) Four days later, Starkenburg contacted Wells Fargo and indicated that he believed himself to be the beneficiary of Kinney's accounts. (DSSMF ¶ 62.) While Starkenburg was the beneficiary of both the IRA and TOD account, it was determined that Kedzierzawski was still recorded as the beneficiary of the Annuity. (*Id.* ¶¶ 63–64.) Notes indicate that Prudential was already aware of the discrepancy, and that Wells Fargo's legal department was reviewing the issue. (*Id.* ¶ 67.) On July 10, 2019, Starkenburg produced a copy of Kinney's death certificate (which was necessary to gain access to the accounts) and met with Trotter, Dalzell, and another Wells Fargo employee to discuss Kinney's accounts. (*Id.* ¶ 69.) At that point, Trotter informed Starkenburg that there was a "problem" with the Annuity, in that the beneficiary had never been changed. (*Id.* ¶ 70.) However, Trotter assured Starkenburg that Wells Fargo would work to make sure the beneficiary was updated. (*Id.*) To that end, Dalzell faxed Prudential a request to update the beneficiary to Starkenburg. (DSSMF, Ex. A-2, Trotter Dep., WFA000094.)

Throughout July, the disbursement of the death benefit remained under review by Prudential. (DSSMF, Ex. A-2, Trotter Dep., WFA000094.) In mid-July, Dalzell reached out for a status update and was informed that Prudential had escalated the issue to their legal department. (DSSMF, Ex. A-2, Trotter Dep., WFA000094.) Later, on July 25, 2019, Prudential sent an email indicating that the Estate was the proper beneficiary of the Annuity. (DSSMF, Ex. A-2, Trotter Dep., WFA000094.) According to Dalzell's notes, after speaking with both Prudential and Wells Fargo's back office, he reached out to Starkenburg to inform him that Wells Fargo had "worked with Prudential for their judgment" on the Annuity and that, based on the documentation provided (Wells Fargo's TOD form, the Divorce Decree, and Kinney's Death Certificate), Prudential would be naming the Estate as the beneficiary. (DSSMF, Ex. A-2, Trotter Dep., WFA000095.) He also

informed Zachary Kinney, one of Kinney's sons, that the executor of the estate could contact Wells Fargo to receive more information about the Annuity. (DSSMF, Ex. A-2, Trotter Dep., WFA000095.)

On August 5, 2019, Starkenburg's attorney sent a Notice of Claim ("Notice") to Prudential, copying Trotter on the email. (Pl.'s Position Statement Re: Jurisdiction ("PPSJ"), Ex. 8, WFA000035.) The Notice set forth that Starkenburg claimed the right to the death benefit of the Annuity. (PPSJ, Ex. 8, WFA000035.) To support his claim, Starkenburg's counsel relied on email exchanges between Kinney, Trotter, and Dalzell from April 2017 regarding Kinney's desire to change the beneficiaries on his Wells Fargo accounts. (PPSJ, Ex. 8, WFA000035–36.) The following day, on August 6, 2019, Starkenburg's attorney emailed Trotter and Dalzell to request aid in securing payment of the death benefit directly from Prudential. (PPSJ, Ex. 9.) In particular, he requested that Wells Fargo provide documentation related to Kinney's attempts to change his beneficiaries. (PPSJ, Ex. 9.) In response to this email, Wells Fargo's Complaint Department opened a formal Complaint File as to Starkenburg. (PPSJ, Ex. 10.)

While awaiting a response from Prudential, Starkenburg's counsel reached out to Dalzell to inquire about the existence of any competing claims to the death benefit and, if so, whether the funds had already been disbursed. (DSSMF, Ex. A-2, Trotter Dep., WFA000090.) Naomi Lynn, a Branch Manager and First Vice President at Wells Fargo, responded that Starkenburg's counsel would need to direct any questions regarding the Annuity to Prudential as it was a Prudential product. (DSSMF, Ex. A-2, Trotter Dep., WFA000089.) Starkenburg's counsel replied that he understood and that, going forward, he would contact Prudential for any information concerning the competing claims. (DSSMF, Ex. A-2, Trotter Dep., WFA000089.)

5

Throughout August 2019, Wells Fargo and Prudential continued to communicate about Starkenburg's claim to the death benefit. On August 16, 2019, Dalzell spoke with a counterpart at Prudential who, after receiving communications from Starkenburg's attorney, had some questions regarding Wells Fargo's communications with Kinney. (PPSJ, Ex. 11.) Within Wells Fargo, Dalzell followed up on this conversation by requesting that the individual in Wells Fargo's Compliance/Complaint Resolution department handling Starkenburg's complaint also reach out to Prudential's contact. (PPSJ, Ex. 11.) And later, in response to a request for an update from Starkenburg's attorney, Prudential indicated that until "Wells Fargo decides how they're going to handle the case, [Prudential's] review is at a standstill." (PPSJ., Ex. 12.)

On October 14, 2019, Wells Fargo initiated the present action pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, to determine the proper beneficiary, joining Prudential, Kedzierzawski, the Estate,[2] and Starkenburg as Defendants. Shortly thereafter, the Court entered the parties' Agreed Order directing Prudential to deposit the death benefit into the Court's registry pursuant to Federal Rule of Civil Procedure 67. (Dkt. No. 30.) This Order also granted interpleader relief to Prudential, discharging it from all liability to the adverse claimants (Kedzierzawski, the Estate, and Starkenburg) relating to the Annuity. None of the parties filed a motion to dismiss.

The remaining parties all now have moved for summary judgment and seek a declaration as to the proper beneficiary of the Annuity. After considering these motions and reviewing the attached evidentiary support, however, the Court raised concerns as to whether Wells Fargo has standing to bring this case. To address this question of jurisdiction, the Court held an oral hearing on and directed the parties to file supplemental submissions on the issue.

---

[2] Initially, Wells Fargo named Kinney's four children as Defendants. After the Estate moved to intervene, Wells Fargo filed an amended complaint substituting the Estate for the children. (Dkt. Nos. 11, 28.)

**DISCUSSION**

Wells Fargo seeks relief pursuant to the Declaratory Judgment Act, which provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Such actions "serve an important role in our legal system insofar as they permit prompt settlement of actual controversies and establish the legal rights and obligations that will govern the parties' relationship in the future." *Hyatt Intern. Corp. v. Coco*, 302 F.3d 707, 711 (7th Cir. 2002). Yet the Declaratory Judgment Act "is not an independent grant of federal subject-matter jurisdiction." *DeBartolo v. Healthsouth Corp.*, 569 F.3d 736, 741 (7th Cir. 2009). Ultimately, "jurisdiction depends upon the nature of the anticipated claims" against the plaintiff in a declaratory judgment action. *Id.* (citation omitted).

Specifically, it is well-established that "[t]he phrase 'case of actual controversy' in the Declaratory Judgment Act 'refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III.'" *Amling v. Harrow Indus. LLC*, 943 F.3d 373, 377 (7th Cir. 2019) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 127 (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). Thus, when "nothing in the declaratory judgment plaintiffs seek would bind [the defendant] or alter the legal relationship of the parties," a court "properly dismiss[es] plaintiffs' action for failure to allege a case or controversy." *Deveraux v. City of Chicago*, 14 F.3d 328, 331 (7th Cir. 1994).

7

Importantly, the doctrine of standing is an "essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). And "[t]o satisfy the 'irreducible constitutional minimum' of Article III standing, a plaintiff must not only establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct, but he must also seek (3) a remedy that is likely to redress that injury." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 797 (2021) (quoting *Spokeo Inc. v. Robins*, 578 U.S. 330, 338 (2016)). If a plaintiff fails to meet these prerequisites and establish standing, a court cannot provide relief under the Declaratory Judgment Act. *See Edgewood Manor Apt. Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761, 777 (7th Cir. 2013) (affirming dismissal of a plaintiff from an action brought under the Declaratory Judgment Act for lack of standing); *see also LJ Consulting Servs., LLC v. SunTrust Inv. Servs.*, 2020 WL 469677, at *5 (N.D. Ill. Jan. 29, 2020) (dismissing a declaratory judgment action for lack of standing when the plaintiff could not show that defendant caused plaintiff's injury).

A court's "first duty in every suit" is "to determine the existence of subject[-]matter jurisdiction." *Johnson v. Wattenbarger*, 361 F.3d 991, 992 (7th Cir. 2004). This is because "[j]urisdiction is the 'power to declare law', and without it the federal courts cannot proceed. Accordingly, not only may the federal courts police subject[-]matter jurisdiction *sua sponte*, they must." *Hay v. Indiana State Bd. Of Tax Comm'rs*, 312 F.3d 876, 879 (7th Cir. 2002) (quoting *Ruhrgas v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999)). And "[n]o party can waive or forfeit a lack of subject-matter jurisdiction, which [the court] must enforce even if everyone else has ignored it." *United States v. Adigun*, 703 F.3d 1014, 1022 (7th Cir. 2012) (internal quotations omitted); *see also Travelers Prop. Cas. v. Good*, 689 F.3d 714, 718 (7th Cir. 2012) ("Jurisdictional objections cannot be forfeited or waived, of course, for this court has an

8

independent obligation to satisfy itself that federal subject[-]matter jurisdiction exists.") (internal quotations omitted). The "proponent of federal jurisdiction has the burden of proof (which is to say, bears the risk of non-persuasion)." *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 540 (7th Cir. 2006) (citing *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)).

When standing is challenged, that means "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Thus, at the summary judgment stage, a plaintiff's failure to come forward with evidence supporting standing may necessitate dismissal for want of subject-matter jurisdiction. *See, e.g.*, *Gracia v. SigmaTron International, Inc.*, 986 F.3d 1058, 1064 (7th Cir. 2021) (holding that while the plaintiff adequately alleged an injury-in-fact so as to confer subject-matter jurisdiction over the claims at the motion to dismiss stage, plaintiff's failure to point to evidence establishing standing in response to the defendant's motion for summary judgment necessitated dismissal for want of subject-matter jurisdiction).

Wells Fargo first insists that it has standing on the basis of the potential competing claims to the Annuity's death benefit and claims that, absent an order by the Court, it could be subject to multiple inconsistent judgments from one or more of the Defendants regarding the death benefit. In other words, Wells Fargo contends that it satisfies the injury-in-fact requirement because of the threat of competing claims. To be sure, courts recognize the existence of an actual controversy when there are competing claims to property. *See Knight v. Enbridge Pipelines (FSP) LLC*, 759 F.3d 675, 677 (7th Cir. 2014) (noting that "the existence of competing claims to real estate means that the controversy is real" for purposes of an action for declaratory judgment). Typically, parties facing such competing claims will bring an interpleader action, either under Federal Rule of Civil

9

Procedure 22 or 28 U.S.C. § 1335. For interpleader to be justified, the stakeholder must have "a real and reasonable fear of double liability or conflicting claims." *Aaron v. Mahl*, 550 F.3d 659, 663 (7th Cir. 2008). This procedure is often used by insurers facing multiple claimants to a single recovery. *See, e.g.*, *Principal Life Ins. Co. v. Noble*, 2019 WL 1651750, at *3 (N.D. Ill. Apr. 17, 2019) (finding jurisdiction over an interpleader action brought by an insurer facing competing claims to a death benefit). Critically, however, in such cases, it is the party who will be paying out the proceeds who brings the case; in fact, to bring a statutory interpleader action pursuant to § 1335, the plaintiff must deposit the stakes into a registry of the court. 28 U.S.C. § 1335; *State Farm Life Ins. Co. v. Jonas*, 775 F.3d 867, 869 (7th Cir. 2014) (finding that a plaintiff insurer failed to file an interpleader under § 1335 when it failed to deposit the stakes with the district court).

But documentation provided in support of the parties' cross motions for summary judgment makes clear that Prudential, not Wells Fargo, holds the Annuity and is thus subject to the competing claims for the death benefit. Although the Annuity was listed among his assets in monthly account statements provided to Kinney by Wells Fargo, each correspondence included a page titled "Annuities/Insurance," which clarified that, "[t]hese positions are not held in your account and are not protected by [the Securities Investor Protection Corporation]. These positions are held directly by the issuing company." (PSMF ¶¶ 19–20.) Other communications between Wells Fargo and Kinney similarly differentiated the Annuity. For example, in 2014, Vee Onsuvanh, a senior client associate at Wells Fargo, sent Kinney a spreadsheet overview of his accounts. (DSSMF ¶ 24.) One of the lines included an entry for account number ending in 1987, titled "Kinney M. Kinney/TOD Registration." (*Id.*) The description "Prudential Annuity—Tax Deferred" was included in the corresponding line for "strategy." (*Id.*) And, at least from 2017 until

Kinney's death, Prudential itself directly sent Kinney quarterly account statements regarding the Annuity. (DKEJSMF ¶¶ 33–34.)

Even after Kinney's death, the record clearly demonstrates that, prior to the filing of the present action, all parties understood that Prudential, not Wells Fargo, was ultimately responsible for any payout of the death benefit. In fact, immediately following Starkenburg's first inquiry as to Kinney's accounts, Dalzell called Prudential and requested that it hold off on paying out the death benefit. (DSSMF, Ex. A-2, Trotter Dep., WFA000098.) As this incident shows, while Wells Fargo communicated and coordinated with Prudential over the Annuity, Wells Fargo ultimately had no authority over the actual disbursement of funds. And in his correspondence with Trotter and Dalzell, Starkenburg's counsel explicitly noted that he was trying to "secure payment of this death benefit *directly from Prudential*." (PPSJ, Ex. 9 (emphasis added).) Wells Fargo repeatedly emphasizes that Starkenburg, and then Starkenburg's attorney, sought Wells Fargo's aid in securing payment of the death benefit. But the mere fact that Wells Fargo potentially possessed documentation that could establish Starkenburg's claim to the death benefit, such as proof of delivery of a change of beneficiary form to Prudential, does not change the reality that Prudential was the only party against which a claim for the death benefit was asserted. While Trotter had earlier assured Starkenburg that Wells Fargo would work to change the beneficiary, at no point did she represent that Wells Fargo itself controlled the payout; rather, both she and Dalzell indicated that they would work to have *Prudential* adjust the beneficiary designation. When those efforts failed and Prudential initially determined that the Estate should receive the death benefit, Dalzell then reached out to inform Starkenburg of *Prudential's* decision. In sum, although Wells Fargo operated as a middleman between Kinney, Starkenburg, and Prudential, at no point did Wells Fargo have final authority over the beneficiary designation or so represent.

11

Indeed, not only was Wells Fargo not responsible for paying out the funds, but it also had no independent means of knowing whether competing claims even existed. When asked about the monetary value of the death benefit or the existence of other claims, Wells Fargo repeatedly directed inquiries to Prudential. For example, in response to Starkenburg's attorney's request for information regarding competing claims to the Annuity, Naomi Lynn, Branch Manager and First Vice President at Wells Fargo, stated that "unfortunately, [Wells Fargo] cannot tell if any competing claims have been made to the annuity—or if the funds have been disbursed—as it is a Prudential Product and not a Wells Fargo Advisors product." (DSSMF, Ex. A-2, Trotter Dep., WFA000089.) Lynn continued by noting that "any questions [Starkenburg's attorney has] regarding the annuity will have to be directed to Prudential." (DSSMF, Ex. A-2, Trotter Dep., WFA000089.) Occasionally, Wells Fargo would convey information about the Annuity, but always made it clear that the information was coming from Prudential. For instance, Dalzell emailed a verbal value received from Prudential in response to Starkenburg's counsel's request that Wells Fargo provide the value of the death benefit at the time of Kinney's passing. (DSSMF, Ex. A-2, Trotter Dep., WFA000088.) In his email, however, Dalzell explicitly stated that Prudential was currently drafting a letter with an official value, and that the value he communicated was based on Prudential's current understanding of the amount. (DSSMF, Ex. A-2, Trotter Dep., WFA000088.)

Moreover, that Prudential is responsible for the payout of the death benefit is confirmed by the Order directing Prudential to deposit the disputed funds with the Clerk of Court.[3] (Order, Dkt. No. 30.) In submitting this Order to the Court, the parties implicitly acknowledged that Prudential is the true subject of any claims to the death benefit. Prudential has the power to pay out the claim,

---

[3] Shortly thereafter, Prudential posted a check in the amount of $172,712.13.

12

and thus the risk of facing competing claims. Indeed, that risk was fully realized **by Prudential**, which faced claims from both the Estate and Starkenburg.

Wells Fargo attempts to assume the risk of competing claims on the basis that Prudential may seek indemnification against Wells Fargo related to any payout of the death benefit. But "[p]laintiffs bear the burden of establishing standing, and each element . . . must be supported by more than unadorned speculation." *Plotkin v. Ryan*, 239 F.3d 882, 885 (7th Cir. 2001). And here, Wells Fargo fails to provide any evidence that any potential indemnification of Prudential rises above mere speculation. Instead of an official indemnification policy, or contract, or even any record indicating that Wells Fargo would have to indemnify Prudential if Prudential faced litigation over the payout of the death benefit, Wells Fargo offers only an email from Prudential to Starkenburg's counsel stating that Wells Fargo's "legal team was still reviewing this case to determine how they *may* be able to protect [Prudential] if [Prudential] agreed to pay out to Luke." (PPSJ, Ex. 12 (emphasis added).) However, nothing in the record suggests that the result of that review was a finding that Wells Fargo did conclusively have a duty to indemnify.[4] Thus, the Court finds that the risk of indemnification is merely speculative and, therefore, insufficient to satisfy jurisdictional standing requirements.

Additionally, Wells Fargo points to the counterclaims by Starkenburg against it as proof that it faced a real threat of litigation at the time it filed suit, thus demonstrating the existence of an actual controversy. But in fact, the counterclaims highlight how a determination of the proper

---

[4] The Court notes that, after Prudential disburses the death benefit, Wells Fargo could properly bring a separate action pursuant to the Declaratory Judgment Act to delineate the scope of any such duty to indemnify, if it so desires. *See, e.g.*, *Atl. Casualty Ins. Co. v. Sealtite Roofing & Constr. Co.*, 73 F.Supp.3d 953, 961 (N.D. Ill. 2014) (denying a motion to dismiss where the insurer sought declaratory judgment that it had neither the duty to defend nor indemnify, specifically finding that the claim regarding the duty to indemnify was not premature where resolving that issue was necessary to resolve the question of the duty to defend). That Wells Fargo could bring a separate action on the question of indemnification, however, does not provide a basis for standing in the current suit.

beneficiary of the Annuity fails to establish legal rights as between Wells Fargo and Starkenburg[5] or settle the potential controversy. Starkenburg asserts claims against Wells Fargo for breach of contract, breach of fiduciary duty, and negligence in the event that he is not deemed the intended beneficiary of the Annuity under the theory that, even if Kinney never successfully affected a change as to the Annuity's beneficiary, his failure to do so was the result of wrongdoing by Wells Fargo. None of those claims may be resolved by a court order verifying the identity of the proper beneficiary. The critical issue underpinning those claims is not who the actual beneficiary *is*, but who it ***should be*** (here, allegedly Starkenburg). Indeed, the counterclaims themselves acknowledge that they exist only in the alternative; that is, once the threshold issue of naming the beneficiary is decided.

Ultimately, the issue is one of redressability. "To determine whether an injury is redressable, a court will consider the relationship between 'the judicial relief requested' and the 'injury' suffered." *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (quoting *Allen v. Wright*, 468 U.S. 737, 753, n. 19 (1984)). Here, the relief sought by Wells Fargo is a declaratory judgment as to the proper beneficiary of the Annuity.[6] Yet if the injury suffered by Wells Fargo is the claims asserted by Starkenburg, a determination of the proper beneficiary does nothing to provide relief. If anything, a finding that Starkenburg is ***not*** entitled to the death benefit would trigger

---

[5] Based on the record, only Starkenburg ever arguably threatened litigation against Wells Fargo. There is no indication that either Kedzierzawski or the Estate was contemplating bringing litigation against Wells Fargo with regards to the Annuity. Kedzierzawski and the Estate merely asserted a claim as to Prudential for the proceeds of the death benefit, after which they were informed that the matter was under review. As stated by counsel at the oral hearing on October 27, 2021, the filing of the present action was the next they heard of the matter.

[6] The counterclaims brought by Starkenburg could not, on their own, establish standing for ***Wells Fargo's*** initial suit. "As the party invoking federal jurisdiction, a plaintiff bears the burden of establishing the elements of Article III standing." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). Indeed, even within the same complaint, "plaintiffs must establish the district court's jurisdiction over each of their claims independently." *Rifkin v. Bear Stearns & Co., Inc.*, 248 F.3d 628, 634 (7th Cir. 2001).

14

Starkenburg's counterclaims. And fundamentally, a plaintiff must establish standing for the particular suit they have filed.

For instance, in *Edgewood Manor*, the plaintiff, the owner of an apartment complex, sought a declaratory judgment stating that an insurer was obligated to pay a claim for replacement cost proceeds for damages caused by a hurricane. 733 F.3d at 764. The litigation proceeded for years with all parties assuming that the replacement-cost claim had been assigned to the plaintiff when the property was sold. *Id.* at 765. However, the parties eventually discovered that the claim had never been assigned; instead, the seller remained the named insured. *Id.* at 771. Even though the plaintiff had a contractual right to recover the proceeds from the seller, the Seventh Circuit found that this "indirect interest" was not enough to establish the plaintiff's standing. *Id.* (holding that, even if such an indirect interest "may be sufficient to establish constitutional standing," the plaintiff "plainly lack[ed] standing under the prudential rule that a litigant cannot sue to enforce the legal rights of another"). The situation here is analogous. Wells Fargo may have an indirect interest in the outcome of the litigation—in that knowing the proper beneficiary will help Wells Fargo determine who may bring claims against it[7]—but *Edgewood Manor* makes clear that this is not enough. In a "declaratory judgment action concern[ing] only the legal rights of the parties to the [] policy," only those who are parties to the policy have standing to bring the action. *Id.* at 771–72. And the record is unambiguous that Wells Fargo has no legal rights to the policy.

The Court recognizes that Wells Fargo does have some interest in the matter of who is the proper beneficiary of the Annuity. After all, if the named beneficiary is not Starkenburg (and possibly even if it is), Wells Fargo is likely to face suit for assorted breaches of duty. But "other than the normal uncertainty a defendant experiences while the statute of limitations is running and

---

[7] The Court notes that this interest is even less direct than that at issue in *Edgewood Manor*, where the plaintiff had a contractual right to the proceeds subject to the declaratory judgment action.

there is a possibility of a later obligation to pay money damages," it is "hard to see what harm" Wells Fargo suffers by having to wait for Prudential either to determine the beneficiary on its own or seek a court order to the same effect. *Hyatt Intern. Corp.*, 302 F.3d at 711. While the Court recognizes that Wells Fargo wishes to know if it will be sued, and if so, by whom, that interest alone cannot provide a basis for standing.

Similarly, the Court appreciates that all parties are eager to resolve this case. The parties are correct that the record establishes that there are competing claims to the death benefit among Kedzierzawski, the Estate, and Starkenburg. And it appears that the parties have all agreed (at least implicitly) that Wells Fargo would take the lead in seeking to resolve those claims. After all, Wells Fargo functioned as a middleman between Prudential and the parties and has in its possession much of the documentation necessary to resolve this action. Yet the fact remains that Prudential, not Wells Fargo, is the subject of the conflicting claims at issue. It is unfortunate that this defect was exposed only after the parties had produced discovery and briefed summary judgment, but the Court must act as a "jurisdictional hawk" and "take[] jurisdiction issues seriously." *Lowrey v. Tilden*, 948 F.3d 759, 760 (7th Cir. 2020). Thus, while the parties may all consent to Wells Fargo bringing this action, the Court has an independent obligation to ensure that there is subject-matter jurisdiction over the claims and, if such jurisdiction is lacking, accordingly dismiss the action.

Finally, the Court notes that the parties to a great extent have treated this litigation as if it were a traditional interpleader action in which the disputed funds are deposited with the court and the disinterested stakeholder released from liability. As discussed above, Wells Fargo is not a stakeholder in the Annuity, and therefore cannot bring such an action. That is not to say, however, that no party could have done so. To the contrary, there appears to be a party capable of bringing

16

an interpleader action to determine the proper beneficiary: Prudential.[8] But the plaintiff in the action that was filed, Wells Fargo, lacks the type of legal interest necessary to satisfy the constitutional requirements of standing. The Court therefore lacks subject-matter jurisdiction and the case must be dismissed.

## CONCLUSION

In sum, the Court finds that Wells Fargo lacks standing and thus there is no actual controversy as required by both the Declaratory Judgment Act and Article III. Accordingly, the case is dismissed without prejudice for lack of subject-matter jurisdiction. Accordingly, the parties' respective summary judgment motions (Dkt. Nos. 48, 52, 58) are denied as moot.

Dated: March 30, 2022

Andrea R. Wood
United States District Judge

---

[8] As noted, there are two types of interpleader actions: statutory and rule. For statutory interpleader, § 1335 "provides the federal court with an independent basis for asserting subject-matter jurisdiction." Mahl, 550 F.3d at 663 (7th Cir. 2008). However, the statute also requires "two or more adverse claimants, of diverse citizenship." 28 U.S.C. § 1335(a)(1). Yet here the claimants (Kedzierzawski, the Estate, and Starkenburg) are all citizens of Illinois.

In contrast, Rule 22 "provides a procedural framework for interpleader actions, but it does not confer subject[-]matter jurisdiction on federal courts." Commercial Nat. Bank of Chi. v. Demos, 18 F.3d 485, 488 (7th Cir. 1994). Thus, in Rule 22 interpleader actions, jurisdiction must arise from either the existence of federal question jurisdiction pursuant to 28 U.S.C. § 1331 or diversity jurisdiction pursuant to 28 U.S.C. § 1332. General Ry. Signal Co. v. Corcoran, 921 F.2d 700, 705 (7th Cir. 1991).

For purposes of Rule 22 actions, "complete diversity is assessed by looking at the plaintiff-stakeholder and the defendant-claimants." Arnold v. KJD Real Estate, LLC, 752 F.3d 700, 704 (7th Cir. 2014) (finding that the district court had jurisdiction to hear a Rule 22 interpleader action brought by the plaintiff-stakeholder, a Florida citizen, to determine who between defendant-claimants, both Illinois citizens, had the right to disputed stock). Here, Prudential (the potential plaintiff-stakeholder) is a citizen of Arizona and, as noted, the potential defendant-claimants are all citizens of Illinois. Additionally, the disputed death benefit is worth $172,712.13, satisfying the $75,000 amount-in-controversy requirement for diversity jurisdiction. 28 U.S.C. § 1332(a).